**Samuel MITCHELL et al.,**
**Plaintiffs-Appellants,**

v.

**WEST FELICIANA PARISH SCHOOL**
**BOARD et al., Defendants-Appellees.**

**No. 73–4034.**

United States Court of Appeals,
Fifth Circuit.

Jan. 30, 1975.

Murphy W. Bell, Baton Rouge, La., for plaintiffs-appellants.

Leon A. Picou, Jr., Dist. Atty., 20th Judicial Dist. Court, Fred C. Jackson, Asst. Dist. Atty., St. Francisville, La., Richard H. Kilbourne, Dist. Atty., W. Lee Overton, Asst. Dist. Atty., Clinton, La., for defendants-appellees.

Before GEWIN, AINSWORTH and GEE, Circuit Judges.

GEE, Circuit Judge:

Desegregating the schools of this small, rural Louisiana parish has occupied us before. Its fortunes in our court and in others, from adoption and subsequent disapproval of a freedom-of-choice system through inclusion in *Singleton*[1]

---

1. Singleton v. Jackson Municipal Separate School Dist., 419 F.2d 1211 (5th Cir. 1970). Generally speaking, this decree requires that, where formerly dual systems are merged, the following initial steps be taken:

1. Effective not later than February 1, 1970, the principals, teachers, teacher-aides and other staff who work directly with children at a school shall be so assigned that in no case will the racial composition of a staff indicate that a school is intended for Negro students or white students. For the remainder of the 1969–70 school year the district shall assign the staff described above so that the ratio of Negro to white teachers in each school, and the ratio of other staff in each, are substantially the same as each such ratio is to the teachers and other staff, respectively, in the entire school system.

The school district shall, to the extent necessary to carry out this desegregation plan, direct members of its staff as a condition of continued employment to accept new assignments.

2. Staff members who work directly with children, and professional staff who work on the administrative level will be hired, assigned, promoted, paid, demoted, dismissed, and otherwise treated without regard to race, color, or national origin.

3. If there is to be a reduction in the number of principals, teachers, teacher-aides, or other professional staff employed by the school district which will result in a dismissal

and earlier attempts to apply that ruling, are catalogued in Carter v. West Feliciana Parish School Board, 432 F.2d 875 (5th Cir. 1970) (*Carter II*) and will not be again detailed here. Our case is, we may hope,[2] the final fall-out from *Singleton*'s application to West Feliciana Parish.

As we have said, the present controversy results from an early attempt to implement *Singleton*. That decision came down at the turn of 1969–70; and the West Feliciana school board, faced with the usual drop in white enrollment of the time, commenced in April of that year to try to comply with its requirements while reducing the teaching staff appropriately. As a part of its consequent staff evaluation program, the board announced that a national academic achievement test would be administered each teacher in the area of his teaching expertise or certification. Objections to this, made to the courts by most of the Negro teachers—on grounds asserted that the tests were culturally biased or would be unfairly administered—resulted in initial temporary restraining orders above and below, both later dissolved, and in an eventual order by this court permitting the administration of the test on conditions set out in *Carter II*. All of the plaintiffs here, untenured Negro teachers in the system, refused to take the test.

In the course of the hearings on the testing programs, the district court, grappling with the application of the new *Singleton* standards, entered an order which approved the use of the tests upon an erroneous construction of *Singleton*. Since *Singleton* required, the court found, the iron application of racial ratios to the reduction in number of the West Feliciana teaching staff, it made no difference whether the test was racially biased or not: the Negro teachers were competing with each other only, for a fixed, reduced number of "black positions." This being so, there would be no occasion to compare their grades on the test with the grades of white teachers who, in turn, were competing only with each other for the "white positions." Following an expedited appeal, a panel of this court, on August 14, 1970, handed down what we shall call *Carter I*, subsequently withdrawn, approving the testing program on reasoning paralleling that of the district court:

> The argument advanced by appellants that the makeup of the tests is so framed as to discriminate racially against Negro teachers misses the mark. Black teachers would not be competing with white teachers. They would simply be competing among themselves for preferred retention in the system if it became necessary to reduce the number of teachers in the system. Testimony below indicated that a reduction in force of 6 teachers would probably be necessary. Maintenance of the 2 black to 1 white ratio would then require the dismissal of 4 black teachers and 2 white teachers. The method of testing under the NTE examinations proposed to be used by the school board as one of the criteria in determining who shall be dismissed and who shall be retained patently was a bona fide and effective effort at compliance with Singleton, supra.

> Prior to such a reduction, the school board will develop or require the development of nonracial objective criteria to be used in selecting the staff member who is to be dismissed or demoted. These criteria shall be available for public inspection and shall be retained by the school district. . . . *Id.* 419 F.2d at 1217–1218.

---

or demotion of any such staff members, the staff member to be dismissed or demoted must be selected on the basis of objective and reasonable non-discriminatory standards from among all the staff of the school district. In addition if there is any such dismissal or demotion, no staff vacancy may be filled through recruitment of a person of a race, color, or national origin different from that of the individual dismissed or demoted, until each displaced staff member who is qualified has had an opportunity to fill the vacancy and has failed to accept an offer to do so.

2. On a happy note, counsel for both sides indicated at oral argument that the current situation is one of good will and constructive effort.

The school board, with the fall semester upon it, moved swiftly to implement this court's construction of the *Singleton* decree, to which it was already subject. Since the Negro teachers, who composed about two-thirds of the faculty, had, with a single exception, all refused to take the test, the board was forced to look elsewhere for objective criteria. Twenty-two teachers, rather than the six at first thought, had to be released and, according to *Carter I*, about two-thirds were to be Negro and one-third white, the racial proportions of the teaching staff in general. The court below found, and its findings are reasonably supported by the evidence, that after the racial ratio the board's primary criterion was tenure, its next was the need for the teacher's subject-matter expertise, and finally, for those who took it, the test. In addition, the subjective evaluations of principals and assistant principals, five white and three Negro, were considered. The preeminence of tenure as a guideline is shown by the fact that only two tenured teachers, whose subject-matter qualifications were in an area of ample or over staffing, were dismissed.

On September 25, however, five weeks after dismissal notices had gone out and school was well in session, *Carter I* was withdrawn and *Carter II* was substituted, making plain that *Singleton*'s ratios were limited in their effect to teacher assignments and that reductions in staff were to take no account of race whatever, but proceed on other standards which were to be objective and reasonable. Since the rendition of *Carter II*, none of plaintiffs have been rehired as regular teachers in the systems. The district court found, however, that no positions for which those of them who would entertain reinstatement were qualified had come open, save Connie Chapman. She had been offered reinstatement but declined because of complications attending the early term of a pregnancy.

On this appeal the judgment below is attacked on four heads: that the board reduced staff without first establishing objective criteria for the reduction, available for public inspection as required by *Singleton*; that *Roth-Sindermann*[3] standards of procedural due process were violated by absence of notice and hearing; that plaintiffs have not been accorded recall rights due them under *Singleton*; and that reinstatement, back pay and damages were appropriate because of the absence of procedural due process but were not granted. We discuss these briefly and in the order presented.

 This is a § 1983 action.[4] For plaintiffs to prevail, it is necessary that they show state action which deprived them of rights, privileges or immunities secured them by the federal laws or Constitution. It is clear from the record, as the court below found, that the board acted in good faith and in obedience to *Carter I*'s authoritative declaration of what *Singleton* required it to do. And though it was the board's notices of dismissal which were the immediate cause of plaintiffs' loss of their positions, the board, acting under great pressure of time, took race into primary account only because a *federal* court's decree, affirmed in an expedited appeal, stated that they were required by *Singleton* to do so. We are unable, under the unique facts of this case, to ascertain meaningful state action in the initial discharges. The effective action was the direct result of initial erroneous decrees of the federal courts. It would be a travesty on justice to subject the board to penalties or sanctions for actions it had no choice but to perform.

 As for the claimed application of *Roth-Sindermann*, it is stipulated that no plaintiff had any form of tenure. None, therefore, had any property interest. Nor were any discharged for reasons even arguably reflecting discredit upon them. Indeed, the administration offered favorable references, etc. Thus, no liberty interest was at stake either.

---

**3.** Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

**4.** 42 U.S.C. § 1983.

Nor is it contended that any plaintiff was discharged for exercise of constitutional rights. In these circumstances, questions of procedural due process do not arise. Bradford v. Tarrant County Junior College, 492 F.2d 133 (5th Cir. 1974).

■ Plaintiffs next claim that they possess *Singleton* rights of recall which have been disregarded.[5] The court below made findings as to each of the six plaintiffs. One, Florence Williams, has withdrawn from the suit and seeks no relief. Samuel Mitchell was out of work only a month and testified by deposition that he did not desire to be reinstated and that his sole claim was for lost wages from the end of August 1970 to the first of October that year. The trial court viewed this as de minimis. Alfred Henry went to work elsewhere upon his discharge and has consistently made more money since than before. He testified that he did not want to be reinstated. Connie Chapman was offered reinstatement after *Carter II* came down but declined because of complications attending her pregnancy. There is no contention that this offer was not made in good faith or was cynically timed. This being the case, the court below felt the board had discharged whatever recall obligation it owed her.[6] As to these four plaintiffs, we conclude that the court's findings are reasonably supported by substantial evidence. The two remaining plaintiffs present closer questions.

Plaintiff Rosa Wilson was employed as a librarian. She was 61 years of age when discharged and, after doing substitute teaching in the interim, retired less than two years later. Obviously she does not now wish reinstatement, but this does not preclude consideration of back pay and other remedies. Plaintiff Velta J. Williams, a teacher of vocal music, has been regularly employed in her specialty by a private school since her discharge and, on her testimony, has suffered no financial loss.[7] The district court found that no position for which either Wilson or Williams was qualified had been filled since their discharges.

Adams v. Rankin County Board of Education, 485 F.2d 324, 326 (5th Cir. 1973) notes: "Under the law in this Circuit, new teachers may not be hired merely because their qualification(s), even if viewed by objective racial criteria, exceed those of the displaced former teachers. If the former teachers are minimally qualified for the jobs they are to receive them."

■ While we are not entirely satisfied that the court below may not have applied a too-strict standard of "qualification" in these two instances, we have examined the evidence and conclude that, on the evidence, by *Adams* standards the question is, in each instance, fairly debatable and the court's findings are therefore not clearly erroneous.

■ We conclude that we cannot say the court below erred in holding none of plaintiffs entitled to reinstatement or other remedy.[8]

■ A final point: at oral argument it was suggested that jurisdiction may be lacking since West Feliciana Parish School Board may not be a "person"

---

5. We shall assume that these exist, since shortly after plaintiffs were discharged this court corrected *Carter I* and any improper refusal to accord *Singleton* recall rights would be the act of the board alone. It is arguable, though plaintiffs do not do so on this appeal, that since *Carter II* established that plaintiffs' initial discharges were, though in obedience to *Carter I*, in fact improper, plaintiffs (and all other teachers discharged) were entitled to direct reinstatement. For this court, however, at this late date, itself to raise such an issue and apply such a remedy, would be to exalt reason above rationality and to apply a keener hindsight to the situation of all the parties than we are willing to do.

6. After she was delivered, Mrs. Chapman applied to the board for work and has been employed ever since as a replacement, though not a regular, teacher.

7. Because, although her salary was somewhat less, her lower travel expenses in commuting—the difference between eight miles a day and ninety miles a day—offset this.

8. Indeed, as will be apparent from the text, this cause borders on the moot: at oral argument counsel conceded that plaintiffs are principally concerned at present to uphold principles and vindicate their personal dignity.

within the meaning of § 1983. See City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973). The point, though noted in the pre-trial order entered pre-*Kenosha*, was not considered by the court below, and no evidence on the nature of such a board appears in the record. Nor was the question briefed or seriously argued before us, rather merely noted. We would be unwilling to attempt such a difficult issue, or one having potential for such far-reaching consequences, without being fully advised. Obtaining evidence on the point, explicit consideration of the question by the court below, and appropriate briefing would require a remand; and the consequences to the parties in this case would not be materially altered from the result we have reached by a decision of this issue either way.

We do not, therefore, think justice would be served by a remand for this purpose, and moreover any error in assuming jurisdiction which we do not have would be harmless. We therefore expressly decline to decide the question [9] and

Affirm.

---

**9.** Precedent for our approach exists in Secretary of Navy v. Avrech, 418 U.S. 676, 94 S.Ct. 3039, 41 L.Ed.2d 1033 (1974). Further, any other course—given our decision on the merits—is nonsense.